$C \supset 5$   $4187$ -

Ogden



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

Jane Doe, as guardian of John Doe, an )
incapacitated person, )
                                      )
      Plaintiff, )
                                      )
v. )  CJ-2025-
                                      )
State of Oklahoma, ex rel., Oklahoma )
Department of Human Services, an agency of )
the State of Oklahoma; Oklahoma State )
Department of Health, an agency of the State of )
Oklahoma; Deborah Shropshire, in her )
individual capacity; Luke Cooper, in his )
individual capacity; Kelly Thompson, in her )
individual capacity; Angela Thompson, in her )
individual capacity; Nancy Unruh, in her )
individual capacity; Ray Hester, in his )
individual capacity; Shelly Robinson, in her )
individual capacity; and Keith Reed, in his )
individual capacity; )
                                      )
      Defendants. )

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

JUN 1 2 2025

RICK WARREN
COURT CLERK
128

CJ - 2023 - 4 . ~ /

## PETITION

COMES NOW, Plaintiff, Jane Doe ("Plaintiff"), as guardian of John Doe, an incapacitated

person, and for her causes of action against Defendants State of Oklahoma, *ex rel.*, Oklahoma

Department of Human Services ("DHS"), Oklahoma State Department of Health ("OSDH"),

Deborah Shropshire, M.D. ("Shropshire") in her individual capacity, Luke Cooper ("Cooper") in

his individual capacity, Kelly Thompson ("K. Thompson") in her individual capacity, Angela

Thompson ("A. Thompson") in her individual capacity, Nancy Unruh ("Unruh") in her individual

capacity, Ray Hester ("Hester") in his individual capacity , Shelly Robinson ("Robinson") in her

individual capacity, and Keith Reed ("Reed") in his individual capacity, (all Defendants

collectively referred to as the "Defendants") (all individual Defendants collectively referred to as

"State Official Defendants"), hereby alleges as follows:

Exhibit 2

## JURISDICTION AND VENUE

1.      Plaintiff Jane Doe is a resident of Oklahoma City, Oklahoma County, State of Oklahoma. Jane Doe is the legal guardian of John Doe.

2.      The Oklahoma Department of Human Services ("DHS") is an agency of the State of Oklahoma responsible for providing public assistance and social services to individuals and families, including providing developmental disability services to persons with intellectual disabilities. DHS regularly provides services in Oklahoma County. Plaintiff provided notice pursuant to 51 O.S. § 151, *et seq.*, on September 17, 2024. Plaintiff has received no response; thus, the tort claim is deemed denied pursuant to 51 O.S. § 157.

3.      The Oklahoma State Department of Health is an agency of the State of Oklahoma. Plaintiff provided notice pursuant to 51 O.S. § 151, *et seq.*, on September 17, 2024. Plaintiff has received no response; thus, the tort claim is deemed denied pursuant to 51 O.S. § 157.

4.      Shropshire was the Director of DHS at all times pertinent to the allegations herein.

5.      Cooper was an investigator with DHS's Office of Client Advocacy ("OCA") at all times pertinent to the allegations herein.

6.      K. Thompson was an investigator with the OCA at all times pertinent to the allegations herein.

7.      A. Thompson was an employee or agent of DHS at all times pertinent to the allegations herein.

8.      Unruh was an employee of DHS at all times pertinent to the allegations herein.

9.      Hester was an employee of DHS at all times pertinent to the allegations herein.

10.     Robinson was an employee of DHS at all times pertinent to the allegations herein.

11.     Reed was the Commissioner of Health at all times pertinent to the allegations herein.

Exhibit 2

12.     Subject matter jurisdiction of this case is proper under Article VII, § 7 of the Oklahoma Constitution.

13.     Personal jurisdiction and venue over these Defendants are proper because they are all domiciled in the State of Oklahoma, created pursuant to the laws of the State of Oklahoma, and/or doing business in the State of Oklahoma. Further, DHS and OSDH are based in Oklahoma County, and all the individual Defendants were or are employed by DHS or OSDH at all times pertinent to the allegations herein.

## STATEMENT OF FACTS

14.     The Robert M. Greer Center ("Greer Center"), formerly the Northern Oklahoma Resource Center of Enid, is a full-time residential treatment center in Enid, Oklahoma, that houses adults with dual diagnoses – an intellectual disability and a co-occurring behavioral and/or mental challenge. *See* 10 O.S. § 1414(A); *see also* 10 O.S. § 1406(A).

15.     Greer Center, in existence since 1988, is a 52-bed facility that is the only one of its kind in the State of Oklahoma.

16.     DHS is required, through the Developmental Disabilities Services Division ("DDSD"), to provide care for individuals with a primary intellectual disability diagnosis and a second mental illness diagnosis. *See* 10 O.S. § 1414.1.

17.     At all times pertinent to the facts herein, the Office of Client Advocacy ("OCA") was housed within DHS. OCA "provides advocacy and assistance, conducts investigations, and maintains grievance programs to promote client safety, independence and the delivery of Oklahoma Human Services (DHS) programs or services, in an unbiased manner." https://oklahoma.gov/health/about-us/office-of-accountability-systems/office-of-client-advocacy.html (last accessed May 21, 2025).

3

Exhibit 2

18.     OSDH is the licensing body for Greer Center, and other similar facilities, as well as the caretakers employed to work at each facility. OSDH performs inspections of the Greer Center.

19.     In 1999, Liberty Healthcare Corporation ("LHC") and/or Liberty of Oklahoma ("LOC") (collectively "Liberty") entered into a contract with the State of Oklahoma to operate Greer Center. Pursuant to this contract, LHC and/or LOC were required to provide medical and rehabilitative services to the residents at Greer Center. *See* Okla. Admin. Code 340:100-11-2.

20.     In February 2000, an association of public employees along with relatives and guardians of Greer Center residents filed a suit to enjoin the contract between the State of Oklahoma and LHC and/or LOC. *See* Okla. Cty. Case No. CJ-2000-1108 and *Oklahoma Pub. Emps. Ass'n v. Oklahoma Dep't of Cent. Servs.*, 2002 OK 71, 55 P.3d 1072.

21.     In *Oklahoma Pub. Emps. Ass'n*, the Oklahoma Supreme Court held "that when express contractual authority is not granted, DHS possesses those implied contractual powers that are necessary for the effective discharge of the duties expressly conferred upon DHS." *Id.* at ¶ 1, 1076.

22.     Interestingly, and pertinent to this matter, DHS stated in its briefing in that case that the quality of care for Greer Center residents would remain in the control of DHS. *Id.* at ¶ 18, 1080.

23.     DHS retains the right to investigate LHC and/or LOC operations at the Greer Center without notice and terminate the contract immediately if the health and safety of residents is endangered by Liberty. *Id.*

24.     DHS can also request termination of any employee at Greer Center and requires Liberty to give two weeks' notice before replacing staff. *Id.*

25.     Liberty is required to operate Greer Center in accordance with DHS policies. *Id.*

Exhibit 2

26.    This contract has been repeatedly renewed over the years. The State of Oklahoma has paid Liberty nearly $100 million since 1999 to operate Greer Center.[1]

27.    At all times pertinent, Sage was the Executive Director of Greer Center, as well as the Chief Executive Officer of LOC and an Executive Director with LHC.

28.    At all times pertinent to the issues leading to the causes of action herein, Tatro was the Unit Program Manager at Greer Center.

29.    At all times pertinent to the issues leading to the causes of action herein, Huhman was the Intake/Placement Coordinator at Greer Center.

30.    Liberty staffed Greer Center with a variety of employees and agents, including, but not limited to, nurse aides, registered nurses, medical doctors, and psychologists.

31.    Sage, as the Executive Director of Greer Center, was responsible for overseeing the staff and ensuring that they are providing the proper care to the clients, including John Doe.

32.    Tatro, as the Unit Program Manager, was responsible for overseeing the staff and ensuring that they provide proper care to the clients, including John Doe.

33.    Huhman, as the Intake/Placement Coordinator, was responsible for overseeing the staff and ensuring that they are providing the proper care to the clients, including John Doe.

34.    The Perpetrators of the abuse were all employees or agents of Liberty for whom Liberty, DHS, and OSDH were responsible for hiring, supervising, training, and retaining. However, DHS and OSDH failed to oversee the care of John Doe at the Greer Center, resulting in severe, intentional injuries.

---

[1] This contract was not renewed by the Senate in 2024 after the wake of the underlying abuse allegations coming to light.

Exhibit 2

35.    Hester was an employee or DHS responsible for overseeing the contract between the State of Oklahoma/DHS and Liberty. Hester's failure to ensure compliance with the contract resulted in John Doe's abuse and neglect.

36.    Cooper and K. Thompson were OCA investigators tasked with responding to claims of abuse and neglect at Greer Center. Cooper's and K. Thompson's failure to respond to complaints and enforce corrective actions resulted in John Doe's abuse and neglect.

37.    Unruh, A. Thompson, and Robinson were DHS case workers responsible for ensuring John Doe was cared for and not abused or neglected. Their lack of thoroughness in their check-ups resulted in John Doe's abuse and neglect.

### John Doe's History at Greer Center

38.    John Doe has been dually diagnosed with a plethora of both intellectual disabilities and mental illnesses.

39.    John Doe is considered to have a moderate to severe intellectual disability, having an IQ of approximately 40-50.

40.    Despite being an adult, John Doe's intellectual disability gives him the capacity of approximately a four-year-old child, rendering him unable to protect himself.

41.    John Doe requires 24-hour care and supervision.

42.    John Doe has depended entirely on DHS, including DDSD and the Office of Client Advocacy ("OCA"), to provide for his health and safety, including during his time at the Greer Center.

43.    John Doe was placed at Greer Center by the State of Oklahoma on August 2, 2022, as a result of a then-pending criminal charge. That charge was dismissed in September 2022, but John Doe remained confined to the Greer Center.

6

Exhibit 2

44.    At the Greer Center, John Doe is supposed to receive medical and rehabilitative services as a third-party beneficiary of the contract between Liberty and the State of Oklahoma.

45.    Liberty employees or agents Martinez, Webster, Orozco, and Nieto were a few of the known individuals who worked with or were responsible for providing care to John Doe.

46.    On information and belief, Liberty employees or agents Foster and Flores also worked with or were responsible for providing care to John Doe.

47.    These named individuals are believed to have worked during the evening and overnight shifts, providing care to the Greer Center clients in John Doe's wing after administrative staff had left for the day.

48.    On information and belief, there are additional unnamed individuals who are or were Liberty employees or agents who worked with or were responsible for providing care to John Doe.

49.    Since his arrival at Greer Center, John Doe has sustained numerous injuries with minimal, if any, explanation, along with severe mental and emotional abuse.

50.    According to internal reports by Greer Center employees, John Doe sustained his first injury at Greer shortly after his arrival at Greer Center. A Client Injury Report claims the cause of such injury was a seizure that caused a variety of physical injuries requiring medical treatment. Many alleged seizures appear in John Doe's records, many of which resulted in trips to the local emergency room.

51.    However, some of his reported injuries have no purported explanation documented in the Greer Center records:

   a.  A March 9, 2023, Client Injury Report states that John Doe had numerous lacerations to the head and face.

Exhibit 2

    b.   An April 2, 2023, Client Injury Report describes John Doe as having discoloration to the right shoulder, neck, and chest.

    c.   Another Client Injury Report on June 1, 2023, reports scratches on John Doe's neck, along with bruising.

    d.   A June 15, 2023, Client Injury Report notes injury to John Doe's left side, upper back, and right anterior shoulder, although it is unclear what exactly had gone wrong.

    e.   On June 23, 2023, a Greer Center employee or agent reported that John Doe was red across his neck and chest.

52.    On July 3, 2023, John Doe reportedly tripped on his shoes and hit the edge of his bed while cleaning his room, resulting in a bruise on his stomach. This was reported by Liberty employee or agent Nieto.

53.    On July 8, 2023, John Doe allegedly fell in the shower while the Liberty employee or agent tasked with supervising John Doe went to get towels, resulting in a trip to the emergency room and stitches across his eyebrow.

54.    Greer Records indicate many incidents of John Doe tripping, falling, and/or slipping in the shower, resulting in injuries, despite John Doe requiring around-the-clock supervision to prevent such incidents.

### The Investigation Into Greer Center Begins

55.    On or about July 10, 2023, the Enid Police Department began investigating the Greer Center and their staff for abusing clients, including John Doe.

56.    On or about August 3, 2023, The Oklahoma State Office of Client Advocacy ("OCA"), a division of DHS, placed Liberty employee Jonathan Martinez ("Martinez") on a "Plan

Exhibit 2

for Immediate Safety" ("OCA Plan") following **substantiated** incidences of abuse of clients, as well as pending allegations.

57.     On information and belief, according to OCA's Plan, Martinez was not to be allowed back at Greer Center until OCA completed its investigation. However, when OCA visited Martinez's home on or around September 13, 2023, investigators learned that he had returned to work, despite the incomplete investigation by OCA.

58.     When confronted by OCA investigators, Tatro, Sage, and Huhman explained the internal investigation conducted by Liberty resulted in a lack of evidence. After Liberty could not internally substantiate the allegations against Martinez, Liberty administration decided to allow him back at work.

59.     OCA did nothing to stop Martinez from going back to work despite previously suspending him due to substantiated complaints of abuse, never continued its investigation into Martinez and others, and failed to protect John Doe from known dangers at Greer Center.

60.     Further, OCA did nothing to reprimand Liberty, nor its licensed administrators, after learning of the violation(s) of the OCA Plan.

61.     At approximately 8:30 a.m. on September 21, 2023, a few days after Martinez was allowed back to work, John Doe was found to have numerous discolorations to his chest and abdomen.

62.     Martinez was assigned to work with John Doe on the evening of September 20 into the morning of September 21.

63.     On the morning of September 21, 2023, after the shift change, other Liberty employees or agents took John Doe to get his medication. John Doe raised his shirt and showed these two staff members bruises on his chest, abdomen, and arm. These staff members reported this to the Greer Center administrators immediately.

Exhibit 2

64.     Martinez was terminated by Liberty on or around September 27, 2023. Despite his termination, the abuse of John Doe and others continued.

65.     After terminating Martinez on September 27, Administrator Anthony Huhman called Enid Police in reference to a possible battery. Huhman told police that Liberty had been investigating abuse of John Doe since September 21, 2023, after he was found to have a large bruise on his chest.

66.     During the investigation, Liberty administrators and DHS learned that Martinez bragged to his coworkers about abusing John Doe, and, that in addition to Martinez, multiple other Liberty employees or agents were suspected of being involved in the injuries John Doe suffered.

67.     Administrator Tatro spoke with John Doe, who identified Martinez as the one who hit him. John Doe also told Tatro that another staff member was present, but he could not recall who it was.

68.     Investigations by both Enid Police and the State of Oklahoma found that the Perpetrators and others would choke John Doe with towels and sheets tied around his neck until he passed out. The Perpetrators and others would then punch, hit, and kick him until he regained consciousness. The investigators concluded it was likely [possible] that these events occurred more than forty (40) times.

69.     One of these events was so severe, that the Perpetrators believed they had killed John Doe. They then threw John Doe headfirst into a door, startling him back to life.

70.     These staff members would use names of others, often names of those who worked during other shifts, to confuse their victims and escape consequences.

71.     While the abuse was occurring, Greer Center Perpetrators would often have one employee serve as a lookout to watch down the hallway for anyone coming.

Exhibit 2

72.    This abuse usually occurred after five (5) p.m., when the administration had left for the day.

73.    The Perpetrators would ensure that other clients in Greer Center knew of their treatment of John Doe and others to intimidate them.

74.    The Perpetrators would also intimidate their victims, including John Doe, so that they would not report the abuse to their families. This included standing over clients when they would speak with their loved ones on the phone, ensuring that the clients would not reveal the horrific abuse going on inside the facility that was supposed to keep them safe.

75.    The Perpetrators would use food and drugs to bribe the other clients to fight each other and not to speak out about the abuse.

76.    The Perpetrators/abusers would then retaliate against clients and co-workers who attempted to speak out about the abuse.

77.    The Perpetrators and others would then fail to complete required Client Injury Reports when a client would suffer from an injury. If a report was completed, the employees would fabricate stories that clients fell or punched themselves to cover up the abuse.

78.    The Perpetrators conspired with others, including superiors, to tell them what to write in the Client Injury Reports and promised to vouch for one another regarding the accuracy of the report.

79.    Since September of 2023, at least nine (9) employees have been terminated from the Greer Center. Eight (8) of those employees have been arrested and faced numerous criminal charges relating to the abuse, including the Perpetrators. Several other employees at the Greer Center have since resigned, including Sage, while others have taken "early retirement."

Exhibit 2

80.     Many clients at Greer Center suffered abuse at the hands of the Perpetrators, but John Doe received some of the worst treatment, including incidents of choking, waterboarding, beating, and verbal abuse.

81.     The descriptions of these abusive events are consistent with the type of injuries found on John Doe, namely the bruising to his neck, chest, and abdomen.

82.     This extreme physical abuse triggered severe emotional distress, worsening John Doe's behavioral problems.

83.     In addition to the allowance of horrific physical and verbal abuse, the Defendants failed to protect John Doe's assets. This has resulted in John Doe's money and personal belongings going missing.

84.     Much of the money John Doe has received, either from family or Social Security has not been properly accounted for, as required by the Oklahoma Nursing Home Care Act, as outlined below.

85.     Further, many of John Doe's personal belongings, such as clothes and shoes, have not been properly documented and largely remain unaccounted for, also in violation of Oklahoma law.

86.     Additionally, John Doe has been the victim of at least two sexual assaults by at least one other client during his time at Greer Center due to Greer Center employees and/or agents failing to provide proper supervision as required by Oklahoma law and client care plans.

87.     At all times pertinent hereto, DHS was supposed to maintain an OCA office on campus at Greer Center. *See* Okla. Admin. Code 340:2-3-51(d)(1).

88.     At all times pertinent hereto, DHS was to establish an ombudsmen program for Greer Center. *See 10* O.S. § 1415.1(A)(2). DHS conferred this responsibility to OCA. *See* Okla. Admin. Code 340:2-3-71(a)(1).

Exhibit 2

89.     At all times pertinent hereto, DHS was supposed to provide an on-site OCA advocate to speak on behalf of Greer Center residents who are unable to voice their own needs and to ensure compliance with applicable rules, regulations, and policies. *See* Okla. Admin. Code 340:2-3-71(f)(1) and 340:2-3-72(d).

90.     At all times pertinent hereto, DHS through OCA was to monitor the well-being of clients. *See* Okla. Admin. Code 340:2-3-72(f).

91.     At all times pertinent hereto, DHS through OCA was to provide training to Greer Center employees regarding their obligation to report suspected incidents of abuse, neglect, exploitation, and caretaker misconduct. *See* Okla. Admin. Code 340:2-3-72(c)(1).

92.     At all times pertinent hereto, John Doe was under the care of the Defendants and relied on the Defendants.

93.     The failure of the Defendants to provide training and supervision of Greer Center employees, failure to establish an on-site advocacy program, and overall failure to monitor the well-being of John Doe and other residents resulted in severe mental, emotional, and physical abuse.

94.     The grossly indifferent behavior of the Defendants resulted in the horrific treatment to John Doe and others. This dereliction of duty resulted in numerous violations of Oklahoma common and statutory law, along with rights guaranteed by the United States Constitution.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### NEGLIGENCE

95.     Plaintiff realleges and incorporates by reference all the foregoing statements as if fully set forth herein.

Exhibit 2

96.     The Defendants, their agents, employees, and/or servants owed a duty to John Doe to use reasonable care to provide him with appropriate care and treatment.

97.     The Defendants, their agents, employees, and/or servants owed a duty to John Doe to use reasonable care to protect him from physical and mental abuse and neglect by both employees and/or agents and other clients.

98.     The Defendants, their agents, employees, and/or servants breached the duties owed to John Doe by neglecting to provide him with required, appropriate care and exposing him to abuse.

99.     The Defendants', their agents', employees', and/or servants' breached the duty of care by:

a.     Failing to properly oversee and supervise Greer Center staff and the facility;

b.     Failing to properly and thoroughly respond to claims and reports of abuse and misconduct by the staff;

c.     Failing to conduct assessments of Greer Center clients and staff;

d.     Failing to report abuse, neglect, and misconduct as required by law;

e.     Failing to have proper policies and procedures in place to prevent neglect and abuse within the Greer Center;

f.     Failing to provide access to medical and mental health personnel capable of evaluating and treating John Doe's serious health needs;

g.     Failing to take precautions to prevent John Doe from further injury;

h.     Violating the Oklahoma Nursing Home Care Act as described herein, constituting negligence *per se*;

i.     Violating the Oklahoma Protective Services for Vulnerable Adults Act as described herein, constituting negligence *per se*; and

Exhibit 2

j.     Violating other Oklahoma laws and statutes applicable to the Greer Center Facility, constituting negligence *per se*.

100.     The DHS and OSDH are vicariously liable for their employees' and agents' negligence and gross negligence, including that of Liberty and its agent and employees.

101.     The State Official Defendants are directly liable for their own negligence.

102.     As a direct and proximate cause of Defendants' negligence and the negligence of their agents and employees, Plaintiff incurred the damages alleged herein, including damages for mental and physical pain and suffering, mental and physical anguish, emotional distress, and other damages and pecuniary loss.

103.     As a result of this willful, reckless, intentional, and malicious conduct, Plaintiff is entitled to punitive damages.

104.     While carrying out their job duties, the Perpetrators, who were employed by Liberty, hit, kicked, punched, choked, and otherwise harmed John Doe.

105.     John Doe was found to have numerous bruises and marks on his chest, abdomen, neck, and shoulders from this abuse.

106.     When DHS, through OCA, learned of this abuse, it suspended Martinez pending an investigation. However, Liberty brought Martinez back to work, allowing John Doe to endure more abuse.

107.     On information and belief, when DHS and the State Official Defendants, namely K. Thompson and Cooper, learned that Martinez had been allowed back to the Greer Center they failed to do anything to prevent Martinez from working, despite a safety plan being in place.

108.     As a direct and proximate cause of Defendants' negligence and the negligence of their agents and employees, Plaintiff incurred the damages alleged herein, including damage for

Exhibit 2

mental and physical pain and suffering, mental and physical anguish, emotional distress, loss of personal property, and other damages and pecuniary loss.

109.    As a result of this willful, reckless, intentional, and malicious conduct, Plaintiff is entitled to punitive damages.

## SECOND CAUSE OF ACTION:
## GROSS NEGLIGENCE

110.    Plaintiff realleges and incorporate by reference the foregoing statements as if fully set forth herein.

111.    "The intentional failure to perform a manifest duty in reckless disregard of the consequences or in callous indifference to the life, liberty, or property of another, may result in such a gross want of care for the rights of others...that the finding of a wilful [sic], wanton, deliberate act is justified." *Fox v. Oklahoma Mem'l Hosp.*, 1989 OK 36, ¶ 5, 774 p.2d 459, 461.

112.    Defendantswere aware, or simply did not care, that there was a substantial risk that the policies and customs it promulgated, the practices it condoned, and the negligence and indifference of its agents and employees would–and were–causing serious harm to clients like John Doe.

113.    This is especially evident in the fact that after learning that Liberty allowed Martinez to come back to work, despite the OCA's suspension of Martinez pending investigation, no action was taken by OCA or DHS to intervene, further investigate or reprimand Liberty or its licensed employees/administrators. This gross negligence led to a complete failure to protect John Doe from known dangers at Greer Center.

114.    Thus, Plaintiff is entitled to punitive damages.

## THIRD CAUSE OF ACTION:
## VIOLATION OF THE OKLAHOMA NURSING HOME CARE ACT
## 63 O.S. §§ 1-1901, *et seq.*

Exhibit 2

115. Plaintiff realleges and incorporates by reference all the foregoing statements as if fully set forth herein.

116. The State Official Defendants violated numerous provisions of the Oklahoma Nursing Home Care Act of 2001, 63 O.S. §§ 1-1901, *et seq.*, including but not limited to, 63 O.S. §§ 1-1918, 1-1920, and 1-1939.

117. The purpose of the Act was "to design, develop and implement policies and procedures that improve the quality of care provided in this state's long-care delivery system for the elderly and disabled." 63 O.S. § 1-1900.1.

118. Greer Center is owned by the State of Oklahoma and is governed by the Oklahoma Nursing Home Care Act. *See* 63 O.S. § 1-1902(10).

119. Plaintiff, on behalf of John Doe, is entitled to bring this action pursuant, in part, to 63 O.S. § 1-1918(F).

120. "Abuse" is defined as "the willful infliction of injury, unreasonable confinement, intimidation or punishment, with resulting physical harm, impairment or mental anguish[.]" 63 O.S. § 1-1902(1).

121. "Neglect" is defined as the "failure to provide goods and/or services necessary to avoid physical harm, mental anguish, or mental illness[.]" *Id.* at (15).

122. Section 1-1918 grants the following rights to residents of these facilities:

    a. "Every resident's civil and religious liberties…shall not be infringed upon and the facility shall encourage and assist in the exercise of these rights." *Id.* at (B)(1). The State Official Defendants violated these rights by allowing John Doe to be abused and neglected.

    b. "Every resident shall have the right, without fear or reprisal or discrimination, to: (1) present grievances with respect to treatment or care that is or fails to be

Exhibit 2

furnished on behalf of the resident or others to: (a) the facility's staff, (b) the facility's administrator..., (e) governmental officials, or any other person[.]" *Id.* at (B)(3)(a). The State Official Defendants violated this right when it failed to establish an on-site advocacy office as required by Oklahoma law.

c.  "Every resident shall have the right to prompt efforts by the facility to resolve grievances the resident may have[.]" *Id.* at (B)(3)(c). The State Official Defendants violated this right when they failed to properly investigate complaints made about Greer Center.

d.  "Every resident shall have the right to receive courteous and respectful care and treatment[.]" *Id.* at (B)(11). The State Official Defendants violated this right by allowing John Doe to be repeatedly abused.

e.  "Every resident shall be free from mental and physical abuse and neglect[.]" *Id* at (B)(12). The State Official Defendants violated this right by allowing John Doe to be repeatedly abused.

123.    The DHS and OSDHare responsible for their employees' and agents' intentional actions and omissions. *See* 63 O.S. § 1-1939(A).

124.    As a result of the violations of the Nursing Home Care Act by all defendants, John Doe suffered severe injuries, both physical and economic, and emotional pain and distress, for which Plaintiff is entitled to actual and punitive damages and cost of suit.

## FOURTH CAUSE OF ACTION:
## VIOLATION OF THE OKLAHOMA PROTECTIVE SERVICES FOR VULNERABLE ADULTS ACT
### 43A O.S. §§ 10-101, *et seq.*

125.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if fully set forth herein.

Exhibit 2

126.    The purpose of the Protective Services for Vulnerable Adults Act is to ensure that vulnerable adults, like John Doe and other clients housed at Greer Center, are protected from exploitation, abuse, and neglect. The services provided pursuant to this Act "**shall guarantee**, to the maximum degree of feasibility, the individual the same rights as other citizens, and at the same time protect the individual from exploitation, abuse, or neglect." 43A O.S. § 10-102(A)-(B) (emphasis added).

127.    The services provided pursuant to the Act include, but are not limited to, "medical care for physical and mental health needs," "social services assistance in personal hygiene, food, clothing, and adequately heated and ventilated shelter," "protection from health and safety standards," "protection from physical mistreatment," and "the transportation necessary to secure any of such services." *See* 43A O.S. § 10-103(A)(2).

128.    John Doe is an incapacitated person as defined by 43A O.S. § 10-103(A)(4).

129.    John Doe is also a vulnerable adult as defined by 43A O.S. § 10-103(A)(5).

130.    The Act defines "caretaker," in pertinent part, as "a person who has:...(a) the responsibility for the care of a vulnerable adult voluntarily[.]" 43A O.S. § 10-103(A)(6). The Defendants assumed responsibility for John Doe voluntarily in 2022 when they placed him at Greer Center.

131.    The Act defines as "abuse" as "causing or permitting: (a) the infliction of physical pain, injury, sexual abuse, sexual exploitation, unreasonable restraint or confinement, mental anguish or personal degradation, or (b) the deprivation of nutrition, clothing, shelter, health care, or other care or services without which serious physical or mental injury is likely to occur to a vulnerable adult by a caretaker or other person providing services to a vulnerable adult[.]" 43A O.S. § 10-103(A)(8).

Exhibit 2

132.    The Act defines "neglect" as "(a) the failure to provide protection for a vulnerable adult who is unable to protect his or her own interest, (b) the failure to provide a vulnerable adult with adequate shelter, nutrition, health care, or clothing, or (c) negligent acts or omissions that result in harm to a vulnerable adult through the action, inaction, or lack of supervision by a caretaker providing direct services[.]" 43A O.S. § 10-103(A)(11).

133.    The Act defines "personal degradation" as "a willful act by a caretaker intended to shame, degrade, humiliate or otherwise harm the personal dignity of a vulnerable adult, or where the caretaker knew or reasonably should have known the act would cause shame, degradation, humiliation or harm to the personal dignity of a reasonable person." 43A O.S. § 10-103(A)(12).

134.    The Act defines "verbal abuse" as "the use of words, sounds, or other communications including, but not limited to, gestures, actions or behaviors, by a caretaker or other person providing services to a vulnerable adult that are likely to cause a reasonable person to experience humiliation, intimidation, fear, shame, or degradation." 43A O.S. § 10-103(A)(17).

135.    The Act requires "[a]ny person having reasonable cause to believe that a vulnerable adult is suffering from abuse, neglect, or exploitation shall make a report as soon as the person is aware of the situation to: 1. The Department of Human Services; or 2. The municipal police department or sheriff's office in the county in which the suspected abuse, neglect, or exploitation occurred." 43A O.S. § 10-104(A).

136.    The Defendants and their agents, employees, and/or servants had a duty to report abuse, neglect, or exploitation of vulnerable adults at the Greer Center. *See* 43A O.S. § 10-104.

137.    The Defendants and their agents, employees, or servants violated the Oklahoma Protective Services for Vulnerable Adults Act by failing to report abuse, neglect, or exploitation of vulnerable adults at the Greer Center, including but not limited to John Doe.

Exhibit 2

138.    Further, the Defendants and their agents, employees, or servants willfully and recklessly concealed, manipulated, and hid the truth about John Doe's health from his family.

139.    Additionally, DHS "shall make a prompt and thorough investigation" of all reports of "abuse, neglect, or exploitation" of a vulnerable adult like Joe Doe. *See* 43A O.S. § 10-105(A). Such investigations are required to make extensive, well-documented findings, and must be provided to different individuals and organizations depending on the specific circumstances. *Id.* at (B)-(F).

140.    DHS is also required to notify "the caretaker of the alleged victim, the legal guardian, and next of kin of the vulnerable adult" and provide them with a "brief oral summary and easily understood written description of the investigation process[.]" *Id.* at § 10-105.1(A).

141.    DHS failed to conduct prompt and thorough investigations into reports of abuse at Greer Center, failed to notify law enforcement, and failed to notify John Doe's family members in any way, resulting in continued abuse of John Doe and others.

142.    As a result of the violations of the Oklahoma Protective Services for Vulnerable Adults Act by all Defendants, John Doe suffered serious injuries and physical and emotional pain and distress, for all of which Plaintiff are entitled to actual and punitive damages.

### FIFTH CAUSE OF ACTION:
### NEGLIGENCE PER SE

143.    Plaintiff re-alleges and incorporates by reference all the foregoing allegations as if fully set forth herein.

144.    "The negligence per se doctrine is employed to substitute statutory standards for parallel common law, reasonable care duties. When courts adopt statutory standards for causes of action for negligence, the statute's violation constitutes negligence per se. To establish negligence per se, the plaintiff must demonstrate the claimed injury was caused by the violation and was of

Exhibit 2

the type intended to be prevented by the statute. Finally, the injured party must be one of the class intended to be protected by the statute." *Howard v. Zimmer, Inc.*, 2013 OK 17, ¶ 13, 299 P.3d 463, 467

145.    As described herein, Defendants violated §§ 1-1918, 1-1920, and 1-1939 of the Oklahoma Nursing Home Care Act. *See* 43 O.S. §§ 1-1918, 1-1920, and 1-1939.

146.    Defendants also violated the Oklahoma Protective Services for Vulnerable Adults Act, 43A O.S. §§ 10-101, *et seq.*, by failing to investigate abuse, neglect, and exploitation of clients of the Greer Center.

147.    Defendants' violation of the Oklahoma Nursing Care Act and/or the Oklahoma Protective Services for Vulnerable Adults Act constitutes negligence *per se*.

148.    Defendants are also responsible for their employees' and agents' intentional acts and omissions. *See* O.S. 2001, § 1-1939(A).

149.    As a result of the violations of the Nursing Home Care Act and/or the Protective Services for Vulnerable Adults Act by all Defendants, John Doe suffered severe injuries and physical and emotional pain and distress, for which Plaintiff is entitled to actual and punitive damages and cost of suit.

## SIXTH CAUSE OF ACTION:
## BREACH OF CONTRACT

150.    Plaintiff realleges and incorporates by reference all the foregoing statements as if fully set forth herein.

151.    Liberty had at all times pertinent to the facts herein, a contract with DHS to provide medical and rehabilitative services to clients at the Greer Center.

152.    This contract, made expressly for the benefit of third-party clients, may be enforced by those clients. *See* 15 O.S. § 29.

22

**Exhibit 2**

153.    As a client of the Greer Center, John Doe is a third-party beneficiary of the contract between Liberty and DHS to receive medical and rehabilitative services.

154.    DHS's actions and failure to act in a reasonable manner to provide medical and rehabilitative services free from abuse or neglect was a breach of the contract between DHS and Liberty.

155.    Therefore, John Doe may recover under the contract because it was made for his benefit.

156.    As a result of DHS's breach of contract, Plaintiff is entitled to actual and compensatory damages.

### SEVENTH CAUSE OF ACTION: VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

157.    Plaintiff realleges and incorporates by reference all foregoing statements as if fully set forth herein.

158.    The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1.

159.    John Doe was involuntarily placed at Greer Center by DHS on August 2, 2022, following an arrest.

160.    At all pertinent times, Greer Center was owned by the State of Oklahoma and operated by DHS.

161.    At all pertinent times, DHS outsourced the day-to-day operations to Liberty via contract; However, DHS continued to maintain the facility, provided oversight of the operation of the facility, and retained ownership of the property and equipment. *See Oklahoma Pub. Emps. Ass'n v. Oklahoma Dep't of Cen. Servs.*, 2002 OK 71, ¶ 22, n. 5, 55 P.3d 1072, 1077, n. 5 (citing

Exhibit 2

the contractual agreement between the two parties, which states that this contract did not and does not "privatize" the facility).

162.    At all pertinent times, Shropshire was the Director of DHS and was ultimately tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he was not deprived of his rights guaranteed by the Constitution of the United States.

163.    At all pertinent times, DHS employee and OCA investigator Kelly Thompson was tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he was not deprived of his rights guaranteed by the Constitution of the United States. K. Thompson failed to enforce corrective action that resulted in John Doe's abuse and neglect.

164.    At all pertinent times, DHS employee and OCA investigator Luke Cooper was tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he was not deprived of his rights guaranteed by the United States. Cooper failed to enforce corrective action that resulted in John Doe's abuse and neglect.

165.    At all pertinent times, DHS employee Angela Thompson was tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he would not be deprived of his rights guaranteed by the Constitution of the United States.

166.    At all pertinent times, DHS employee Nancy Unruh was tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he would not be deprived of his rights guaranteed by the United States.

167.    At all pertinent times, DHS employee Ray Hester was tasked with ensuring that John Doe was safe at Greer Center, *i.e.*, that he would not be deprived of his rights guaranteed by the Constitution of the United States. Hester failed to ensure compliance with the contract between DHS and Liberty, allowing for the abuse and neglect of John Doe.

Exhibit 2

168.    At all pertinent times, DHS employee Shelly Robinson was tasked with ensuring that John Doe was safe at Greer Center, i.e., that he would not be deprived of his rights guaranteed by the Constitution of the United States.

169.    The State Official Defendants were responsible for the involuntary placing and holding John Doe at the Greer Center in August of 2022 to present, triggering the potential for violations of his rights given under the United States Constitution.[2]

170.    The right to personal security constitutes a "historic liberty interest" protected by the Due Process Clause. *See Ingraham v. Wright*, 430 U.S. 651, 673 (1977).

171.    Involuntarily committing a person like Doe and holding them in unsafe conditions also violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982).

172.    Further, "liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part). This interest applies equally to criminal conviction and incarceration as to involuntary commitment. *See Youngberg*, 457 U.S. at 316.

173.    The State Official Defendants, acting under color of Oklahoma and federal law, violated Doe's right to personal security under the Due Process Clause of the Fourteenth Amendment by placing him at Greer Center, a facility they knew was not safe.

174.    The State Official Defendants, acting under color of Oklahoma and federal law, violated Doe's right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment by placing him at Greer Center, a facility they knew was not safe.

---

[2] The placement of Doe does not deprive him of his substantive liberty interests under the Fourteenth Amendment. *See Vitek v. Jones*, 445 U.S. 480 (1980).

Exhibit 2

175.   Further, the State Official Defendants and the State of Oklahoma generally are liable for the violation of Doe's constitutional rights committed by Liberty and its employees and/or agents under the "special relationship doctrine" and the "danger creation theory." *See Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).

176.   The "special relationship doctrine" protects individuals, like Doe, who involuntarily enter state custody and subsequently become reliant on the state, through various agencies and officials, to provide their basic human needs, paramount among those safety. *See Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012). This special relationship triggers a continuing duty that is violated if a state official knew of the asserted danger to Doe or failed to exercise professional judgment with respect thereto, and if an affirmative link to the injuries suffered by Doe can be shown. *See id.* at 580 (internal citation omitted).

177.   Here, the State Officials, namely the OCA investigators, knew that Martinez posed a danger to Doe. They failed to ensure that both Martinez and Liberty complied with the safety plan put in place, allowed Martinez to return to work, and Doe sustained numerous injuries at the hands of Martinez and others due to the OCA investigators' failure to ensure compliance with the safety plan.

178.   Further, the State Official Defendants knew of the unsafe conditions at Greer Center due to dozens of complaints from residents and their families, as well as current and former employees who blew the whistle on the horrific conditions and abuse occurring at Greer Center. However, these State Officials failed to exercise professional judgment to protect Doe and other residents.

179.   State Officials are also liable for the acts of Liberty and/or its employees and/or agents because these officials created the danger that caused the harm to Doe. *See Uhlrig*, 64 F.3d at 573-74.

Exhibit 2

180.   Doe is a member of a limited and specifically definable group: dually diagnosed individuals housed at Greer Center.

181.   The State Official Defendants' conduct of not inspecting the facility, not maintaining the facility, and not providing oversight of the operation of the facility resulted in severe mental, emotional, and physical abuse to Doe and others.

182.   The risk to Doe was obvious, as he is a mentally disabled adult with the capacity of a four-year-old child who cannot protect or advocate for himself. It was made additionally obvious in the wake of numerous complaints from residents, their families, and employees at Greer Center who witnessed the atrocities at issue.

183.   The State Official Defendants acted recklessly in conscious disregard of the risk of abuse and actual abuse occurring by doing little to no investigation of complaints, failing to have an on-site client advocate as required by Oklahoma law, and failing to oversee the care and treatment of the residents, Doe included.

184.   This conduct, which involves failing to protect and advocate for the most vulnerable population in our community, shocks the conscience. Accordingly, the State Official Defendants are liable for the harm caused Doe, including the violation of his Constitutional rights, and Plaintiff is entitled to compensatory and punitive damages.

## JURY DEMAND

Plaintiff demands a trial by a jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully prays for judgment in her favor and against Defendants, jointly and severally, as follows:

    a)  Damages as set out in Causes of Action 1-7, above;

    b)  Attorney's Fees and Cost of Litigation;

Exhibit 2

c) Punitive damages; and

d) Any other relief to which Plaintiff is entitled.

**ATTORNEY LIEN CLAIMED**

Respectfully submitted,

R. Todd Goolsby, OBA #12676
David D. Proctor, OBA #13863
Amber D. Nelson, OBA #33575
Madison A. Botizan, OBA #34615
Rebecca Hargrove-Santos, OBA #35628
GOOLSBY | PROCTOR
701 N. Broadway Avenue, Suite 400
Oklahoma City, OK 73102
(405) 524-2400/(405) 525-6004 (F)
tgoolsby@gphglaw.com
dproctor@gphglaw.com
anelson@gphglaw.com
mbotizan@gphglaw.com
rhargrovesantos@gphglaw.com
*Attorneys for Plaintiff*

Exhibit 2